TENNESSEE SECURITIES, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Tennessee Secur., Inc. v. Commissioner
Docket Nos. 9209-76, 9210-76, 9211-76, 9212-76.
United States Tax Court
T.C. Memo 1978-434; 1978 Tax Ct. Memo LEXIS 82; 37 T.C.M. (CCH) 1803; T.C.M. (RIA) 78434; October 31, 1978, Filed William Waller,James T. O'Hare,Elliott Warner Jones, for the petitioners. Robert B. Nadler, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' income tax and *84 additions to tax: Tennessee Securities,Inc. Taxable Year Ended
Deficiency
September o0, 1969
$ 117,762.60
September 30, 1971
167.15
September 30, 1972
11,925.12
Charles R. and Deanna L. Gaw Calendar Year
Deficiency
1971
$ 39,431.71
1973
271.54
Doyle S. and Ranelle A. Gaw Calendar Year
Deficiency
1971
$ 43,437.75
Lloyd E. and Jeannette A. Gaw Calendar Year
Deficiency
Section 6653(a) addtion [2]
1971
$ 54,319.52
0
1972
7,061.02 $ 353.05
1973
4$ 247.72
212.38
Due to concessions by both parties, the issues remaining for decision are the following: 1. In 1969 the individual petitioners signed personal guarantees of a loan by the Third National Bank of Nashville to Convenience Foods of America, Inc. In 1971 petitioner-corporation, Tennessee Securities, Inc. ("TSI") paid $ 197,531.85 to the Third National Bank in satisfaction of this guarantee. What are the tax consequences of this payment? Specifically: (a) Is TSI entitled *85 to deduct this amount as (i) an ordinary and necessary business expense, (ii) an ordinary loss, or (iii) a bad debt? (b) If TSI is not entitled to deduct this payment, did the individual petitioners realize income due to TSI's payment of their legal obligation? (c) If the individual petitioners realized income due to this payment, are individual petitioners entitled to a business or nonbusiness bad debt deduction? 2. Is TSI entitled to deduct certain payments for travel, entertainment and other expenses incurred by the individual petitioners in 1971 through 1973. 3. Did the individual petitioners realize income due to TSI's payment of their travel, entertainment and other expenses? 4. Are petitioners Lloyd and Jeannette Gaw entitled to certain deductions with respect to their farm? Specifically, (a) Are they entitled to deductions for farm repair and labor expenses in excess of the amounts allowed by respondent? (b) Are they entitled to depreciation deductions in excess of the amounts allowed be respondent? In particular, (i) what is the proper allocation of the $ 30,000 purchase price of the farm between land and depreciable property, and (ii) are they entitled *86 to deduct depreciation with respect to an automobile used on the farm? (c) Are they entitled to deduct insurance premiums of $ 166.87 paid for the automobile? (d) Are they entitled to deduct registration fees paid in connection with their purchase of the farm? 5. Is all or any part of petitioners' Lloyd and Jeanette Gaw's underpayment of tax in 1972 and 1973 due to negligence or intentional disregard of rules and regulations? FINDINGS OF FACT Some of the facts have been stipulated by the prties and are found accordingly. At the time they filed their petitions, the individual petitioners were all residents of Nashville, Tennessee. Jeannette, Deanna and Ranelle Gaw are parties only by virtue of having filed joint returns with their husbands. When we hereafter refer to the individual petitioners, we will be referring to Doyle, Charles and Lloyd Gaw.Petitioner-corporation Tennessee Securities, Inc. ("TSI") was incorporated in 1960 under the laws of Tennessee. Its principal place of business is Nashville. TSI adopted a fiscal year ending September 30. 1. Guaranty of Bank Loan to Convenience Foods. TSI is a broker-dealer firm engaged in the business of underwriting *87 securities distributions and effecting securities transactions for its own account and as agent for others. It is registered under the Tennessee Securities Law of 1955 [3] and the Securities Exchange Act of 1934. n3a TSI is a member of the National Association of Security Dealers. During the years 1969 through 1971 (except as noted below) petitioners owned shares of TSI and held corporate offices as follows: Petitioner
Share Percentage
Offices
1969-1970
1971
1969-1970
1971
Doyle Gaw
35.0
none *
President
none **
Charles Gaw
35.0
70.0 *
Vice Pres.
Pres. **
Lloyd Gaw
23.6
26.8 ***
Treasurer
V.P. and Treas.
93.6
96.8
*** Wendell Beard sold his 3.2% interest to Lloyd Gaw in 1971. Doyle Gaw left TSI on April 15, 1971 to pursue other business interests. In 1969 Doyle Gaw met Steve Pierce ("Pierce").Pierce was *88 a successful operator of seveal franchise stores and a fried chicken retailing company, and he had just formed his own company, Convenience Foods of America, Inc. ("Convenience Foods"). Pierce told Doyle Gaw about his idea of franchising fast food restaurants. He hoped to establish franchises in many smaller cities; each franchisee would be sold a modular (prefabricated) building, suitable for use as a fast-food restaurant, complete with all the necessary equipment. At the time Pierce talked to Doyle Gaw, the fast-food business was undergoing rapid expansion. Many new franchises involving famous individuals were formed, especially in Nashville. [4] Pierce planned to form a chain of restaurants called "Dine-Quick"; he had already sold one unit in Hendersonville, Tennessee. Petitioners visited this unit, as well as a facility where Pierce was planning to manufacture the modular buildings. Peitioners concluded that Pierce had a viable concept. They believed that with sufficient capital Convenience *89 Foods would establish a financial "track record" and in a few months could raise more than a million dollars in a public securities offering. Such a public offering would be a financial boon to TSI which would earn a commission on the offering ranging from 9 to 13 percent. In order to secure needed capital, petitioners and Pierce arranged for a $ 200,000 loan to Convenience Foods from the Third National Bank. On July 3, 1969, the individual petitioners executed a guarantee of all indebtedness of Convenience Foods to the Third National Bank. On that date the Third National Bank loaned $ 200,000 to Convenience Foods. Convenience Foods executed a first ninety-day note, and after the first note matured, it executed a second ninety-day note. A note due March 20, 1970, was executed on January 6, 1970. The officers of TSI concluded that a non-corporate guarantee would be in the best interests of TSI because of the so-called "net capital rule." [5] The Securities and Exchange Commission ("SEC") has promulgated various rules applicable to brokerdealer companies; the net capital rule provides that a brokerdealer may not assume aggregate indebtedness (as defined by the SEC) in excess *90 of 2,000 percent of its net capital. Basically, net capital is defined in terms of liquidity. Net capital is calculated by adding subordinated liabilities n5a to nt worth, adjusting the value of securities held to reflect marketability, and writing off, inter alia, unsecured accounts and fixed assets. The officers of TSI believed that if TSI incurred a contingent liability of $ 200,000 by guaranteeing the loan to Convenience Foods, TSI's net capital would be reduced by that amount and, accordingly, its participation in underwritings would be curtailed. A reduction in net capital of $ 200,000 would greatly curtail TSI's ability to participate in future underwritings. Such a reduction would not have placed TSI in immediate violation of the net capital rule, but petitioners wanted to maintain TSI's capital cushion.
Petitioners' guarantee was not the only security the Third *91 National Bank received for its loan to Convenience Foods; the stock of Monarch Leasing was pledged to the bank by Convenience Foods as security for the loan. Monarch Leasing was a whollyowned subsidiary of Convenience Foods set up for the purpose of leasing buildings and equipment to Convenience Foods' franchisees. Petitioners, as guarantors, obtained mortgages against the buildings owned by Monarch Leasing. They received no other consideration or security for their guarantee. There were no written agreements between TSI and Convenience Foods that TSI would guarantee the loan. The corporate minutes of TSI contained no reference to any contractual agreement between TSI and Convenience Foods. No memorandum exists of conversations between representatives of TSI and Convenience Foods.In making the loan to Convenience Foods, the bank relied upon the personal guarantees of the individual petitioners. TSI did not guarantee the bank loan to Convenience Foods. Doyle Gaw represented to the Third National Bank on a financial statement dated May 8, 1970, that he was contingently liable in the amount of $ 66,666 on a loan to Convenience Foods.
Mr. Roy Shank, the certified public accountant *92 who was engaged by TSI and audited TSI and prepared its financial statements and Forms X-17A-5 statements for filing with the SEC was informed by TSI that it had no undisclosed contingent liabilities in its fiscal years ended September 30, 1969, 1970 and 1971. Based on his audit he concluded that TSI did not have any undisclosed contingent liabilities, and the financial statements and Forms X-17A-5 do not disclose any such liabilities. TSI acquired 17,500 shares of Convenience Foods on August 25, 1969 at a cost of $ 17,500. TSI claimed a long-term capital loss on this stock on its tax return for the year ended September 30, 1971. Doyle Gaw acquired 7,333 shares of Convenience Foods stock at a cost of $ 6,600 in 1968. Charles Gaw acquired 7,333 shares of Convenience Foods stock at a cost of $ 10,000 in 1969. Convenience Foods failed as a business venture not long after it received the loan from the Third National Bank. Pierce quickly left the company (and Tennessee), and Convenience Foods officially defaulted on its obligation to the Third National Bank in March 1970. The bank was unable to collect from Convenience Foods and therefore turned to petitioners and demanded that *93 they honor their guarantee. Petitioners, in order to honor their guarantee, liquidated the buildings which were covered by the mortgages which they had received from Convenience Foods. They realized only slightly more than $ 30,000 (gross) from the mortgages, and selling expenses reduced their net recovery from the mortgages to $ 23,000. The recovery was small because some of the buildings were subject to claims which had priority, such as a sheriff's lien. Petitioners also leased certain of Convenience Foods' equipment to two restaurant operators, but the lessees defaulted almost immediately. Petitioners paid the bank $ 6,000 of the proceeds of the mortgage foreclosures prior to September 30, 1971. On that date TSI borrowed $ 197,531.85 and pettioners borrowed $ 17,000 and, jointly, they paid these amounts to the Third National Bank in satisfaction of Convenience Foods' debt plus accrued interest. Petitioners paid $ 17,000 because they had collected this amount through mortgage foreclosure. [6] Three weeks prior to this payment, on September 9, 1971, the board of directors of TSI agreed that petitioners' guarantee had been undertaken on behalf of the company and that the *94 obligation was, in fact, an obligation of TSI which should be satisfied by TSI. This decision was reached at a directors' meeting and is reflected in the corporate minutes of TSI. In 1972 and 1973 TSI was investigated by the SEC. As a result of this investigation, on October 18, 1973, the SEC issued an administrative order charging TSI with violations of the securities laws. This order alleged, inter alia, that TSI failed to disclose material facts to investors, violated credit regulations, and failed to disclose a contingent liability on its books. The SEC's determination that a contingent liability had not been carried on the corporate books and records was based solely on TSI's corporate minutes dated September 9, 1971, when TSI agreed to pay petitioners' obligations arising from the guarantee. All financial statements filed by TSI prior to that date had failed to disclose this liability. As a result of this investigation, a settlement was reached whereby TSI was suspended from securities dealings for 35 days and petitioners were suspended from associating with any broker-dealer *95 for 6 months. No specific finding that TSI had incurred a contingent liability was made by the SEC. In the statutory notices, respondent determined that TSI was not entitled to deduct the $ 197,531.85 paid to the Third National Bank in satisfaction of the guarantee of the loan to Convenience Foods. With respect to this payment, respondent further determined that the payment by TSI constituted income to petitioners and that petitioners were entitled to nonbusiness bad debt deductions. 2. Travel and Entertainment Expenses.
TSI maintained branch offices in four cities--Memphis, Knoxville, and Chattanooga, Tennessee, and Huntington, West Virginia--as well as the main office in Nashville during the years in question. TSI's officers (petitioners and Beard) regularly visited these offices to supervise TSI's employees there. During these visits, TSI's officers trained salespersons and solicited business on behalf of TSI. In addition, TSI's activity as a "market-makrer" in some securities caused the officers to travel extensively to promote such securities. When petitioners and Beard traveled on behalf of TSI, they charged [7] many of their expenses to TSI's American Express *96 cards which had been issued to them. They used these American Express cards only for business purposes. Although these travels were solely for business purposes, they did not maintain contemporaneous records. Despite the lack of contemporaneous recirds, petitioners and Beard reconstructed many of their travel expenditures from the American Express card receipts. They compiled an eleven-page statement listing, for most expenditures, the amount of each expenditure, the location, the persons involved and the reason for the expenditure. Some of the expenditures listed, however, were incurred either before or after the years in issue. Similarly, Beard and Doyle Gaw listed some expenditures which were incurred after April 15, 1971--the date they left the employ of TSI. Finally, Charles Gaw could not recall the names of individuals entertained or the business purpose of meetings in many instances. The following table summarizes the American Express expenditures by petitioners and Beard: Person
Year
Amount
Beard
pre-10/1/70 $ 252.40
10/1/70 - 4/15/71
2,801.83
post - 4/15/71
1,133.11
Doyle Gaw
pre-10/1/70
144.58
10/1/70 - 4/15/71
2,093.46
post - 4/15/71
2,286.47
Lloyd Gaw
pre-10/1/70
11.04
10/1/70 - 9/30/71
1,646.62
10/1/71 - 9/30/72
2,696.52
10/1/72 - 9/30/73
602.65
post - 9/30/73
20.33
Charles Gaw
pre-10/1/70
69.69
10/1/70 - 9/30/71
823.55 * 555.70 **
10/1/71 - 9/30/72
1,289.04 * 730.70 **
10/1/72 - 9/30/73
90.49 **
*97 Petitioners were members of the Nashville City Club (the "Club") during the years in issue. Because personal contacts are very important in the securities business, they often took clients of TSI to the Club for lunch. At these lunches business was usually discussed.Petitioners, however, did not maintain contemporaneous records of their use of the Club, and they could recall only the names of the people who, during the course of the year, they entertained at the Club. Petitioners had no specific recollection whom they entertained at the Club on any given day. They used the facilities of the Club only for business entertaining, and all the expenses incurred at the Club were for business purposes. Petitioners charged their expenses at the Club to TSI. Respondent disallowed TSI's claimed travel and entertainment deductions of $ 20,673.68 for TSI's 1971 fiscal year, $ 14,210.77 for fiscal 1972 and $ 10,633.66 for fiscal 1973. *98 [8] These travel and entertainment expenses were broken down as follows: Year
Type
Amount
1971
American Express
$ 15,381.53
Nashville City Club
2,904.91
Other
2,387.24
1972
American Express
7,547.33
Nashville City Club
2,411.71
Music City Golf Gournament
600.00
Other
6,063.44
1973
American Express
4,956.17
Nashville City Club
1,924.83
Other
3,752.66
Respondent determined that the following expenses paid by TSI were taxable as dividends to petitioners: Petitioner
Year
Payee
Amount
Lloyd Gaw
1971
Nashville City Club $ 450.06
1972
Nashville City Club
1,113.50
(New York)
300.00
Unknown
1,075.00
1973
Nashville City Club
424.29
unknown
325.00
Doyle Gaw
1971
Nashville City Club
946.07 [9]
Traffic violations paid
22.00
Charles Gaw
1971
American Express
3,780.96 [10]
Nashville City Club
1,026.68
1973
Nashville City Club
696.26
*99 3. Farm Expenses.
In 1972 Lloyd Gaw purchased a farm in Williamson County, Tennessee, for $ 30,000.The farm is located approximately 30 miles from Nashville, and consists of 60 acres of land, plus a five-room house, a smoke house, a chicken house, a tool shed and a wood shed. Lloyd also purchased various pieces of farm equipment (included in the $ 30,000 price). Subsequently Lloyd purchased a truck and some brood mares and cows. At the time of the purchase, the farm was in a very remote location, and it was accessible only by a gravel road and a dilapidated bridge. [11] Both the house and the barn were in poor condition at the time of the purchase, and both buildings, as well as the fence surrounding the farm, were sorely in need of repair. A family lived in the house on the farm but, because they looked after the farm, Lloyd did not charge them rent. Repairs to the farm were made by Mr. Smithson, a local handyman, as well as Lloyd's cousins and others. Smithson made minor repairs to the barn, including fixing the gates and stalls; he made no major improvements. The other laborers Lloyd hired included *100 Messrs. Perkinson, Bennett, Roland, Weinberg, Nannie and Gentry; the work they performed (they were paid for 57 days' labor) is not known. Rather than replacing the fence at an estimated cost of $ 10,000, Lloyd also had repairs made to it. Repairs to the fence cost approximately $ 1,600. Lloyd personally supervised some of the repairs which were made. To get to and from the farm, he purchased an automobile (at a cost of $ 6,200) and an old truck in November 1972. He kept both vehicles at his home most of the time, and Lloyd's wife used the automobile as her personal car. Lloyd did not keep a contemporaneous record of his trips to the farm, but he did maintain a special checking account in which he recorded all expenditures of the farm. He would often travel to the farm to make a delivery or pay a laborer, and he would return to Nashville the same day. Each check (on a separate day) in his checkbook represents a trip to the farm, and return. He made 14 trips to the farm in 1972 and 102 trips in 1973, although only 3 of the trips in 1972 and 40 of the trips in 1973 were definitely made in the car. As to the remainder of his trips to the farm, there is no evidence as to which *101 vehicle he drove. Prior to his purchase of the farm, Lloyd drove 1,100 miles in 1972 in connection with an option which he obtained (but did not exercise) on another farm.These trips were made before he purchased the automobile in November 1972. At the time Lloyd purchased the farm, the land was worth $ 15,000, the buildings were worth $ 10,000, the fence was worth $ 2,000 and the machinery was worth $ 3,000. Respondent determined that Lloyd Gaw was not entitled to deduct $ 4,827.93 for farm labor and repair expenses in 1972. Specifically, respondent determined that $ 1,600 paid to Lloyd's seven and eight year old sons was not for services rendered, [12] and that $ 3,227.93 was paid for capital improvements to the farm buildings. As to 1973, respondent disallowed farm labor and repair expenses of $ 5,292.75, of which $ 2,400 was paid to Lloyd's sons [13] and $ 2,892.75 was for capital improvements to the buildings. Respondent disallowed additional claimed labor and repair expenses of $ 418.73 in 1972 on the grounds that these expenses were incurred before Lloyd purchased the property. In addition, respondent disallowed labor and repair expenses for fencing of $ 583.27 in 1972 *102 and $ 1,025 in 1973. Respondent also disallowed depreciation deductions of $ 2,716.82 in 1972 and $ 6,303.68 in 1973 as follows: (1) respondent disallowed depreciation on Lloyd's automobile, and (2) respondent allowed a basis for purposes of depreciation of only $ 13,721 in the farm house, barn, machinery and fencing (Lloyd claimed a basis of $ 27,485 in these items). Respondent further disallowed a deduction for insurance premiums paid on the automobile of $ 166.87 on the grounds that this was a personal expense. Respondent disallowed a claimed deduction of $ 107.50 for registration fees paid in connection with the purchase of the farm on the grounds that these were capital expenditures. 4. Negligence Penalty.
Respondent also determined that part of Lloyd's underpayment of tax in 1972 and 1973 was due to negligence or intentional disregard of rules and regulations. OPINION 1. Guarantee of Bank Loan to Convenience Foods.
A.Deduction by TSI.
The first issue is the tax treatment of Tennessee Securities' payment of $ 197,531.85 in satisfaction of *103 the individual petitioners' obligation on their guarantee of the loan by the Third National Bank to Convenience Foods. Petitioners contend that Tennessee Securities ("TSI") is entitled to deduct this payment; respondent asserts that TSI is not entitled to a deduction and, if we so hold, that the payment constitutes income to petitioners, who are then entitled to a nonbusiness bad debt deduction. For reasons expressed below, we agree with respondent. At the threshold, this case presents difficult factual questions which we have resolved in our Findings. We believe that, due to the complicated nature of the transactions involved, a summary of these Findings is called for. Briefly, in 1969 petitioners met Pierce who was promoting a fast-food franchise called Convenience Foods. Petitioners, who were broker-dealers and controlled TSI, a broker-dealer firm, were interested in Convenience Foods. The individual petitioners and TSI wanted to invest in Convenience Foods' stock in order to realize gain on the stock. Petitioners were also interested in the prospect of a public offering of Convenience Foods' stock, from which offering TSI and, through their ownership of TSI, petitioners *104 stood to profit handsomely. Since Convenience Foods was a new company, however, it needed to establish a financial "track record" before other investors would be willing to buy its stock. Accordingly, petitioners and Pierce concluded that Convenience Foods should borrow approximately $ 200,000 to enable it to operate a few months and establish such a "track record." Third National Bank loaned Convenience Foods $ 200,000 and petitioners personally signed the note as guarantors. When Convenience Foods failed, and petitioners' guarantee was called, their obligation was paid by TSI. We conclude, contrary to petitioners' contention, that TSI was not obligated to hold petitioners harmless. Prior to September 9, 1971, all TSI documents--its financial statements, its reports to the SEC and its minutes--clearly reflected that the guarantee was the obligation of petitioners alone. Only petitioners signed the guarantee. On September 9, 1971, however, TSI's board of directors agreed that petitioners' guarantee "was made for the benefit of [TSI]" and voted to satisfy the obligation. Petitioner Doyle Gaw testified that there had been an understanding from the beginning of the transaction *105 that TSI would hold petitioners harmless on the guarantee.We find Doyle Gaw's testimony not credible on this point and therefore disregard it. Petitioners contend they signed the guarantee in order to keep the contingent liability off TSI's books and records. Since TSI's records filed with the SEC did not reflect this guarantee, its net capital was not reduced. If the obligation were TSI's, then by their action petitioners (and TSI) violated the SEC's broker-dealer regulations. These regulations require that all contingent liabilities must be disclosed on a broker-dealer's financial statement. [14] In fact, when TSI later "disclosed" this liability on its minutes, the SEC filed charges against TSI alleging, inter alia, that TSI had failed to disclose a contingent liability. [15]
Respondent *106 also asserts that petitioners guaranteed the note because they had a personal financial interest in Convenience Foods. In support of this contention, respondent points to the fact that Doyle and Charles Gaw reported the sale of Convenience Foods stock on their 1971 income tax returns. At their trial, however, petitioners denied that they owned Convenience Foods stock, and they offered this explanation: Petitioners promoted several fast-food chains in 1969 and they invested in several of them. Included in these new companies petitioners were promoting was Maryland Fried Chicken. Petitioners contend they purchased stock in Maryland Fried Chicken at the time when respondent contends they purchased stock in Convenience Foods. Since petitioners did not receive share certificates from Maryland Fried Chicken when both Maryland Fried Chicken and Convenience Foods folded, petitioners mistakenly concluded that they owned shares of Convenience Foods. Again we do not find petitioners' testimony credible. The documentary evidence--petitioners' tax returns--is more convincing then their story. Furthermore, in light of petitioners' confidence in Convenience Foods, we conclude that they *107 did invest in the company. While only Doyle owned stock in Convenience Foods at the time the guarantee was signed, both the petitioners and TSI had an interest in investing directly in Convenience Foods before any underwriting and, in fact, not only Doyle but also Charles and TSI did invest in Convenience Foods' stock. Because of these investments, both actual and contemplated, petitioners apparently had good and sufficient reason for signing the guarantee of Convenience Foods' bank loan. When it was called, however, they turned to their corporation, TSI, for payment of the guarantee. Since the obligation was that of the individual shareholders, and not that of TSI, TSI is not entitled to a deduction under any theory. B. Income to Individual Petitioners.
On September 30, 1971, TSI paid $ 197,531.85 to the Third National Bank in satisfaction of the individual petitioners' legal obligation on the guarantee of a $ 200,000 loan to Convenience Foods. The payment was made in response to the bank's demand upon the individual petitioners to satisfy their obligation. In paying the bank, TSI satisfied petitioners' legal obligation to the bank, thereby increasing their wealth by *108 the amount of the obligation they were relieved of. As this Court stated in Sachs v. Commissioner,32 T.C. 815, 819 (1959): [16]
It has been held many times by the Supreme Court that Congress, in defining "gross income" as broadly as it did in section [61], intended to exert the full measure of its taxing power and to tax all gains except those specifically exempted. Commissioner v. Smith,324 U.S. 177; Commissioner v. Glenshaw Glass Co.,348 U.S. 426; Commissioner v. Lobue,351 U.S. 243, and cases cited therein. It is also well established that if an obligation of a taxpayer is paid by a third party the effect is the same as if the third party had paid the money to the taxpayer who in turn paid his creditor. Old Colony Trust Co. v. Commissioner,279 U.S. 716; Douglas v. Willcuts,296 U.S. 1; U.S. v. Boston & M.R. Co.,279 U.S. 732; U.S. v. Hendler,303 U.S. 564; and Wall v. U.S., (C.A. 4) 164 F. 2d 462.
In accordance *109 with well-established precedents, we hold that petitioners had gross income equal to the obligation they were relieved of when TSI paid their guarantee of Convenience Foods' bank loan. C. Nonbusiness Bad Debt Deduction.
Next we must determine whether, as respondent contends, petitioners are entitled to a nonbusiness bad debt deduction on TSI's payment of $ 197,531.85 to the Third National Bank in satisfaction of petitioners' personal guarantee of the loan to Convenience Foods because the loss on the indebtedness did not arise in connection with their trade or business. In general, a taxpayer is allowed a deduction for any debt which becomes worthless in the taxable year. Section 166(a) In the case of individuals, section 166(d) supersedes section 166(a) and provides that a debt other than "a debt created or acquired * * * in connection with a trade or business of the taxpayer" or "a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business," is deducted as a nonbusiness bad debt. Section 166(d)(2). A nonbusiness bad debt is treated like a short-term loss from the sale or exchange of capital assets. Section 166(d)(1)(B). Section *110 1.166-5(b), Income Tax Regs., provides that if the loss resulting from the debt becoming worthless bears a "proximate" relation to the condut of business by the taxpayer, the debt qualifies as a business bad debt. In determining whether the proximate relationship is present, the proper standard is one of dominant motivation rather than significant motivation. U.S. v. Generes,405 U.S. 93 (1972). Moreover, upon payment by the guarantor of a debt, the guarantor steps into the creditor's shoes and the debtor's obligation to the creditor becomes an obligation to the guarantor. Putnam v. Commissioner,352 U.S. 82, 87-88 (1956). In determining whether a debt is a business or nonbusiness debt, the same standards are applied where the debt arose through a guarantee. Section 1.166-8(b), Income Tax Regs.Our question, therefore, is whether Convenience Foods' debt to petitioners was a business or nonbusiness debt. Devoting one's time and energies to the business of a corporation (TSI), without more, is not a trade or business. Whipple v. Commissioner,373 U.S. 193 (1963). The fact that TSI might make money in an underwriting of Convenience *111 Foods' stock does not in itself make Convenience Foods' debt to petitioners a business debt. Nor have petitioners suggested that their employment with their controlled corporation motivated them to guarantee Convenience Foods' debt. See Trent v. Commissioner,291 F. 2d 669 (2nd Cir. 1961). We conclude that petitioners hoped to experience gains from current and future purchases and sales of Convenience Foods' stock, and they expected an increase in the value of their TSI stock due to the future underwriting by TSI of Convenience Foods' stock. These expectations motivated petitioners to guarantee Convenience Foods' debt. These are investment motives, not business motives. We conclude that petitioners are entitled to a nonbusiness bad debt deduction with respect to their guarantee of Convenience Foods' bad debt. [17]
2. Travel and Entertainment Expenses.
The next issue is whether TSI is entitled *112 to deduct certain payments for travel, entertainment and other expenses incurred by the individual petitioners in 1971 through 1973. On its corporate income tax returns, TSI claimed deductions for three types of expenditures incurred during those years: (1) travel and entertainment expenditures incurred by petitioners and charged to their corporate American Express cards; (2) business meals at the Nashville City Club (the "Club") charged to TSI by petitioners; and (3) other expenses. Petitioners contend that TSI is entitled to deduct these expenditures as ordinary and necessary business expenses; respondent asserts that (1) petitioners have not proven that these were ordinary and necessary expenses within the meaning of section 162 and (2) petitioners have not satisfied the substantiation requirements of section 274 for the travel and entertainment expenditures. In general, section 162 allows as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. The Supreme Court has stated that "ordinary and necessary" business expenses include those expenditures which bear a proximate relationship to the taxpayer's *113 business and are appropriate and helpful for that business. Welch v. Helvering,290 U.S. 111, 113 (1933); Commissioner v. Tellier,383 U.S. 687, 689-90 (1966). In addition, expenses for travel away from home, entertainment and gifts are not deductible unless the substantiation requirements of section 274 are satisfied. Turning first to the "other" expenses, respondent determined that TSI was not entitled to deduct claimed "other" business expenses of $ 2,387.42 in 1971, $ 6,603.44 in 1972 and $ 3,752.66 in 1973. With the exception of a payment of $ 600 in 1972 to the Music City Golf Tournament, there is no indication in either the statutory notice or the record as to the purpose of the "other" expenses. With respect to the golf tournament, petitioners presented no evidence. In other words, the record before us is completely devoid of any evidence establishing that these "other" expenses were ordinary and necessary. We must conclude that petitioners have failed to carry their burden of proof with respect to these "other" expenses. Rule 142(a), Tax Court Rules of Practice and Procedure.
The remainder of the expenses which TSI seeks to deduct--travel *114 and entertainment expenses charged to TSI's American Express card and business meals at the Club--are within the ambit of section 274. Travel away from home and entertainment are not deductible without substantiating evidence. [18] Specifically, for travel expenses the taxpayer must show the time, place, business purpose and amount of the expenses incurred (section 1.274-5(b)(2), Income Tax Regs.); for entertainment expenses, the taxpayer must show the time, place, business purpose, the amount of the expenses incurred, and the business relationship of the guest to the taxpayer (section 1.274-5(b)(3), Income Tax Regs.).Furthermore, substantiation of such elements by "adequate records" is required. Section 1.274-5(c)(1), Income Tax Regs.Section 1.274-5(c)(2), Income Tax Regs., provides that, in general, in order to meet the "adequate records" requirement the taxpayer must maintain an account book, diary or similar record as well as documentary evidence for each expenditure. The account book or diary must be prepared or maintained in such a manner that each recording of an element of an expenditure is made at or near the time of each expenditure. Section 1.274-5(c)(2)(ii), Income *115 Tax Regs.
In this case, petitioners concede that they did not maintain contemporaneous records of their expenditures. They contend, however, that despite their admitted failure to comply with the "adequate records" requirement, they have *116 provided other evidence which satisfies the requirements of section 1.274-5(c)(3), Income Tax Regs.
This section provides: (3) Substantiation by other sufficient evidence. If a taxpayer fails to establish to the satisfaction of the district director that he has substantially complied with the "adequate records" requirements of subparagraph (2) of this paragraph with respect to an element of an expenditure, then, except as otherwise provided in this paragraph, the taxpayer must establish such element-- (i) By his own statement, whether written or oral, containing specific information in detail as to such element; and (ii) By other corroborative evidence sufficient to establish such element. If such element is the description of a gift, or the cost, time, place, or date of an expenditure, the corroborative evidence shall be direct evidence, such as a statement in writing or the oral testimony of persons entertained or other witness setting forth detailed information about such element, or the documentary evidence described in subparagraph (2) of this paragraph. If such element is either the business relationship to the taxpayer of persons entertained or the business purpose *117 of an expenditure, the corroborative evidence may be circumstantial evidence. We agree with petitioners in part. Turning first to the American Express expenditures, TSI's officers (petitioners and Beard) regularly travelled on behalf of the company. These travels included visits to TSI's four branch offices in cities other than Nashville as well as travels to promote securities for which TSI was a "market maker." On these travels they often charged expenses to corporate American Express cards which had been issued to them. They used these American Express cards only for business travel.
In order to meet the substantiation requirements of section 274, petitioners presented as evidence the American Express receipts for some of the expenditures incurred during the years in issue. Since these receipts did not identify the purpose of the expenditures, however, petitioners and Beard also presented at trial an eleven-page statement listing in most instances the amount of each expenditure, the location, the persons involved and the reason for each expenditure. This statement represents the testimony that they would have presented had they been required to account for the American *118 Express expenditures on an item-by-item basis. For the most part the statement presented by petitioners and Beard satisfies the requirements of section 1.274-5(c)(3), Income Tax Regs. Specifically, petitioners and Beard have presented documentary evidence through their American Express receipts as to the amoun, date and place of each expenditure, and their testimony (through the statement) has added the business purpose and the name of any individuals entertained. We believe that the statement presented at trial is exactly the kind of specific evidence which this section contemplates. See Dowell v. United States,522 F. 2d 708 (5th Cir. 1975), cert. denied 426 U.S. 920 (1975); Lennon v. Commissioner,     T.C.M.    , 47 P-H Memo. T.C. par. 78,176 (1978). [19]
Several of the items listed on the statement, however, are not deductible. First, petitioners and Beard listed some expenses incurred *119 prior to October 1, 1970, which is the begining of the first fiscal year of TSI in issue here. Since we lack any explanation why these expenditures are included in this list, no deduction for them is allowed.Similarly, Lloyd Gaw listed some expenses incurred after the close of the last fiscal year in issue; no deduction is allowed. The statement provided by Charles Gaw was also not as detailed as the statements supplied by the other petitioners and Beard. Specifically, in some instances the statement does not list either the name of the individuals entertained, the reason for the travel or entertainment, or both. Regulations section 1.274-5(c)(3) allows oral testimony to supply missing elements otherwise required by section 274(d). We conclude that in those instances where Charles' statement does not provide either the name or the business purpose, no deduction is allowable. See Dowell v. United States,supra.
Finally, we are troubled by a disparity in the testimony of Beard and Doyle Gaw. Both individuals left the employ of TSI on April 15, 1971, to pursue other business endeavors; their written statements, however, encompass expenditures incurred several *120 months after that date. Although some of the expenditures were allegedly incurred on TSI's behalf, we hold that TSI is not entitled to a deduction for any expenditures incurred by Beard or Doyle Gaw after they left its employ. Specifically, we emphasize that there is no evidence in the record explaining why individuals no longer employed by TSI incurred business expenses on its behalf. Absent such evidence, we conclude that TSI has not carried its burden of proving that these expenditures were ordinary and necessary business expenses. Accordingly, we hold that TSI is entitled to deduct only the following American Express expenses: Expenses incurred by
TSI fiscal year
Amount
Beard
1971
$ 2,801.83
Doyle Gaw
1971
2,093.46
Lloyd Gaw
1971
1,646.62
Lloyd Gaw
1972
2,696.52
Lloyd Gaw
1973
602.65
Charles Gaw
1971
823.55
Charles Gaw
1972
1,289.04
Turning to the expenses incurred at the Club, petitioners contend that they have met the requirements of section 274 with respect to these expenses. Again, petitioners and Beard maintained no contemporaneous diary of their expenditures at the Club. However, they also did not have any specific recollection *121 as to whom they entertained at the Club on any given day. They submitted only a list of the names of the people who, during the course of the year, they entertained at the Club. Petitioners have not satisfied the substantiation requirements of section 274(d) with respect to these expenditures. Although they used the Club only for business purposes, petitioners have failed to establish the business relationship to TSI of each individual entertained. See section 1.274-5(b)(3)(v), Income Tax Regs. The business purpose of a meal can be inferred from the business relationship of a guest to his host, section 1.274-5(c)(2)(b), Income Tax Regs., but it is precisely the identification of the guest that is lacking here. Petitioners contend that the receipts from the Club, plus their testimony as to the names of persons entertained throughout the year, are sufficient to meet the burden of substantiation. They point to Regulations section 1.274-5(c)(3), as establishing the sufficiency of their oral testimony as to the names of the individuals entertained.We disagree. Regulations section 1.274-5(c)(3) allows specific oral testimony to fulfill the substantiation requirements when one *122 or more elements were not provided at the time the expense was incurred. In other words, if petitioners could testify, for each invoice, as to the individual entertained, this would be the type of oral testimony envisioned in the regulation. However, general testimony as to the names of individuals entertained is insufficient. Dowell v. United States,supra;Lennon v. Commissioner,supra.
The next issue is whether the individual petitioners realized income due to TSI's payment of their travel, entertainment and other expenses. TSI paid petitioners' monthly bills at the Club; it also paid cash to Lloyd Gaw for nonspecific purposes and paid Doyle Gaw's fines for traffic violations in 1971. Taking into account concessions by respondent, the following payments were determined by respondent to be constructive dividends: Petitioner
Year
Payee
Amount
Lloyd Gaw
1971
Nashville City Club $ 450.06
1972
Nashville City Club
1,113.50
(New York)
300.00
Unknown
1,075.00
1973
Nashville City Club
424.29
Unknown
325.00
Doyle Gaw
1971
Nashville City Club
497.64
Traffic Violations
22.00
Charles Gaw
1971
Nashville City Club
1,026.68
1973
Nashville City Club
696.26
*123 It is well settled that a corporation's expenditures which are exclusively for the personal benefit of its shareholders constitute a constructive dividend to them. Ashby v. Commissioner,50 T.C. 409, 417 (1968). Whether expenditures were for corporate or personal benefit is a factual question. Turning first to the Club bills paid by TSI for Lloyd and Charles Gaw, respondent's determinations are in error. Charles and Lloyd used the Club only for business entertaining, and all the expenses they incurred there were for business purposes. They frequently took clients of TSI to the Club for lunch, and at these lunches business was usually discussed. In his brief, respondent concedes that disallowance of a deduction for these expenditures under section 274 is insufficient grounds for finding that these payments were a constructive dividend; respondent concedes that we must also find that the payments were not ordinary and necessary business expenses. We conclude that Charles and Lloyd Gaw have adequately shown that these expenditures were for ordinary and necessary business purposes. As to Doyle Gaw, we reach the same conclusion for all of his expenditures at the *124 Club prior to April 15, 1971--the date he left the employ of TSI. However, respondent also determined that TSI paid one bill on his behalf to the Club after that date; specifically, TSI paid the Club $ 51.44 on his behalf on July 11, 1971. Doyle presented no evidence to show that this payment was an ordinary and necessary business expense of TSI. He also presented no evidence to establish that this payment constituted a gift to him by TSI. Therefore, we conclude that Doyle failed to carry his burden of proof; this payment by TSI was income to him. We hold, however, that payments made to the Club prior to April 15, 1971, were ordinary and necessary business expenses of TSI and are not income to Doyle. Turning to petitioners' other expenses paid by TSI, we sustain respondent's determinations. Specifically, as to Lloyd Gaw, respondent determined that Lloyd realized income in 1972 of $ 1,075 for unknown payments and $ 300 for a payment denominated "(New York)" in the statutory notice, and respondent determined that Lloyd realized income from other unknown payments totalling $ 325 in 1973. Although Lloyd does not have to satisfy the substantiation requirements of section 274, *125 he must show that the expenses were ordinary and necessary for TSI. The only explanation Lloyd presented was his generalized testimony that he received cash advances from TSI before he traveled. Lloyd did not claim that he ever received an advance for a trip to New York. We do not know the date, destination, or business purpose of any of the alleged travel, nor the amount of expenses Lloyd incurred. Lloyd has failed to carry his burden of proving that the amounts paid to him were for ordinary and necessary business purposes of TSI, and we hold, therefore, that he realized income in the amount of these payments. Similarly, Doyle Gaw presented no explanation as to why TSI paid fines he incurred for traffic violations, and we hold these amounts were income to him in 1971. 3. Farm Expenses.
The next issue is whether Lloyd Gaw is entitled to certain deductions with respect to his farm. In 1972 Lloyd purchased a farm in Williamson County, Tennessee, for $ 30,000. The farm is located approximately 30 miles from Nashville, and consists of 60 acres of land, plus a five-room house, a smoke house, a chicken house, a tool shed and a wood shed. Respondent determined, first, that *126 Lloyd was not entitled to deduct $ 4,827.93 for farm repairs and labor in 1972 and $ 5,292.75 for farm repairs and labor in 1973. [20] Respondent determined that these amounts were paid for capital improvements to the buildings instead of farm repair. Farm repair deductions (including labor costs) of $ 4,207.76 in 1972 and $ 2,892.75 in 1973 were allowed. The cost of incidental repairs which neither materially add to the value of property nor appreciably prolong its life is deductible.Section 1.162-4, Income Tax Regs. On the other hand, capital expenditures for permanent improvements made to increase the value of property are not deductible. Section 263. Whether improvements are permanent or merely repairs is a factual question. The burden of proof is on Lloyd. Rule 142(a), Tax Court Rules of Practice and Procedure.On the evidence before us, we must sustain respondent's determination. Lloyd hired a local handyman, Mr. Smithson, to make minor repairs to the barn, including fixing the gates and stalls. He also hired several other *127 laborers. We do not have, however, a breakdown of the work done. Specifically, we do not know which laborers (other than Smithson) performed repairs, the nature of the work done or its cost. Mr. Smithson's testimony that he only made minor repairs was credible, but this testimony does not account for the large amount expended. The amount allowed as a farm expense deduction by respondent is large enough to include Smithson's repairs. Moreover, other individuals performed and were paid for 57 days' labor and we do not know whether these other individuals made repairs or permanent improvements. Due to these doubts, we must conclude that Lloyd has failed to carry his burden of proof as to the repairs to the barn and other facilities. Respondent also disallowed additional claimed labor and repair expenses of $ 418.73 in 1972 on the grounds that these expenses were incurred before Lloyd purchased the property. Lloyd presented no evidence regarding this amount.We conclude that Lloyd has failed to carry his burden of proving that he is entitled to this claimed deduction. Rule 142(a), Tax Court Rules of Practice and Procedure.
Respondent also disallowed Lloyd's claimed deductions *128 for fence repairs of $ 583.27 in 1972 and $ 1,025 in 1973. Again respondent determined that Lloyd had made nondeductible capital expenditures. We disagree with respondent's determination. The total cost of fence repair was $ 1,608; the only credible evidence we have is that a new fence would have cost at least $ 10,000. In addition, we hold infra that Lloyd had a basis of $ 2,000 in the fencing. Taking into consideration all the evidence, we conclude that Lloyd's expenditure of $ 1,608 could have only been for repairs. Accordingly, Lloyd is entitled to the claimed deductions. The next question is whether Lloyd is entitled to depreciation deductions in excess of the amounts allowed by respondent. The parties dispute the allocation of the $ 30,000 purchase price of the farm between the land (non-depreciable) and the buildings, equipment and fencing (depreciable) as follows: Item
Respondent's value
Petitioner's value
Buildings
$ 10,000
$ 19,700
Fencings
500
2,500
Machinery
3,221
5,285
Land
16,279
2,515 Respondent also disallowed Lloyd's claimed depreciation deduction for his automobile. Turning first to the value of the land, the only testimony *129 presented was that of Mr. Tom Herbert, a real estate broker. Herbert had written respondent in 1974 that the land was worth around $ 15,000, but at trial he testified that the land was worth only $ 6,000. Under the circumstances we conclude that the better evidence of value is Herbert's letter to respondent. We hold that the land was worth $ 15,000 when Lloyd purchased the farm. We further hold that the buildings were worth $ 10,000 and the remaining $ 5,000 is attributable to the fence ($ 2,000) and machinery ($ 3,000). As to the automobile, in November 1972 Lloyd purchased an automobile and truck to get to and from the farm. He kept both vehicles at home, though, and his wife used the automobile as her personal car.Lloyd did not keep a contemporaneous record of his trips to the farm, but he was able to reconstruct his travels using his checkbook. He made 14 trips to the farm in 1972 and 102 trips in 1973, although only 3 trips in 1972 and 40 trips in 1973 were definitely made in the car. As to the remainder of the trips to the farm--which was 60 miles roundtrip from his home in Nashville--there is no evidence which vehicle he drove. Petitioner claimed that 3/4 of the automobile's *130 use in 1972 and 1973 was for running the business of the farm, and he claimed a depreciation deduction accordingly. Turning first to 1973, we know that Lloyd made 40 trips to the farm in his car in 1973, but we don't know whether the remaining 62 trips were made in his car or truck. Making an approximation, Cohan v. Commissioner,39 F. 2d 540, 544 (2d Cir. 1930), we hold that Lloyd made 50 trips to the farm in his car in 1973. At 60 miles per roundtrip, Lloyd drove 3,000 miles for farm purposes in the car in 1973. Lloyd has proved that the automobile was used partially for farm purposes in 1973, but we lack evidence sufficient to determine what percentage of total usage these 3,000 miles constitute. We have before us only vague testimony by Lloyd that he drove approximately 12,000 to 13,000 miles every year; we find this testimony insufficient proof of the total miles driven.Absent this information, we cannot allow a depreciation deduction since the portion of total use for business purposes is indeterminable. Boyd Construction Company, Inc. v. United States,339 F. 2d 620, 623 (Ct. Cl. 1964). Rather than completely deny a deduction, however, *131 we note that under Rev. Proc. 70-25, 1970-2 C.B. 506, taxpayers were entitled to deduct 12 cents per mile in 1973 for the operating and fixed costs of a car used for business purposes. We hold that Lloyd is entitled to deduct $ 360 (3,000 X 12") for automobile expenses in 1973. As to 1972, we again lack evidence as to the total miles Lloyd drove, but we know that he made three trips to the farm in that year. He is entitled to deduct $ 21.60 for automobile expenses in that year. [21] Since the 12" a mile covers all automobile costs, including insurance, petitioner is not entitled to deduct $ 166.87 paid for insurance in 1973. Rev. Proc. 70-25, supra.
The next question is whether Lloyd is entitled to deduct registration fees paid in connection with his purchase of the farm. Respondent determined that these *132 fees were capital expenditures, and petitioner presented no evidence on this question. We must conclude that Lloyd failed to carry his burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
4. Negligence Penalty.
The final issue is whether any part of Lloyd's underpayment of tax in 1972 and 1973 was due to negligence or intentional disregard of rules and regulations. Section 6653(a) provides for an addition to the tax of 5 percent of the underpayment where "any part" of such underpayment is due to negligence.The burden of proof rests on petitioner to rebut respondent's determination. Bixby v. Commissioner,58 T.C. 757, 791 (1972). Lloyd has conceded that he incorrectly claimed deductions for farm labor expense of $ 1,600 in 1972 and $ 2,400 in 1973 for amounts paid to his young sons. He also claimed deductions for depreciation in excess of amounts to which he was entitled, and he failed to account for expenditures by TSI on his behalf. We conclude that Lloyd has not carried his burden of proving that these errors were not caused by negligence. Since the penalty respondent determined must be imposed if anypart of the underpayment *133 is due to negligence or intentional disregard of rules and regulations, we must sustain respondent's determination. Decision will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith for purposes of trial, briefing and opinion: Lloyd E. and Jeannette A. Gaw, Docket No. 9210-76; Charles R. and Deanna L. Gaw, Docket No. 9211-76; and Doyle S. and Ranelle A. Gaw, Docket No. 9212-76.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.↩
3. Tenn. Code Ann. § 48-1601 et seq. (1955). n3a. 15 U.S.C. § 78a↩ seq. (1934).
*. Doyle Gaw sold his 35% stock interest to Charles Gaw on or about April 15, 1971. ** Doyle Gaw resigned as president and director on April 15, 1971, and Charles Gaw was elected president.↩
4. Among the franchises begun at that time were businesses formed by Pat Boone, Tennessee Ernie Ford, minnie Pearl and Little Jimmy Dickens. Many of these companies failed.↩
5. 17 C.F.R. § 240.15c3-1 (1665). n5a For purposes of the net capital rule, subordinated liabilities are defined as liabilities subordinate to the claims of all creditors and customers of the broker-dealer. Such liabilities are, in essence, similar to contributed capical.↩
6. Petitioners collected $ 23,000 net, of which $ 6,000 had previously been paid to the bank.↩
7. Petitioner Lloyd Gaw also took cash advances from TSI prior to going on trips. He would use this cash to pay for taxis, telephones, tips and other incidentials.↩
*. For these amounts, Charles Gaw provided the names of the persons entertained and/or visited and the purpose of the travel. ** For these amounts, Charles Gaw could not remember either the names of the persons entertained or the purpose of the travel.↩
8. TSI had no taxable income for fiscal 1973 because of losses and therefore no deficiency with respect to this year.↩
9. Respondent conceded $ 448.43 of this amount. Of the remainder, $ 51.44 was incurred after April 15, 1971. ↩
10. Respondent conceded this amount.↩
11. The bridge and road have subsequently been improved.↩
12. Petitioner Lloyd Gaw has conceded this amount. ↩
13. Petitioner Lloyd Gaw has conceded this amount.↩
14. 17 C.F.R. § 240.17a-5 (1967)↩. 15. Because the SEC's charge was settled (detrimentally to petitioners and TSI) and because we do not know whether the failure to disclose this liability or, for example, the alleged fraud violation was the basis for the settlement, we do not rely on the SEC allegation as proof that TSI had incurred the contingent liability.↩
16. Affd. 277 F. 2d 879 (8th Cir. 1960), cert. denied 364 U.S. 833↩ (1960).
17. There is no question in our minds that Convenience Foods' debt became worthless in 1971. Petitioners presented lengthy and detailed evidence of their attempts to recover from Convenience Foods, and we are satisfied that every reasonable effort was made.↩
18. Section 274(d) provides: (d) Substantiation Required. --No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation, * * *
unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, * * * (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, * * *. The Secretary may by regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations.↩
19. This evidence also establishes that these expenditures (with the exception of expenditures by Doyle Gaw and Beard after they left TSI, discussed infra↩) were ordinary and necessary business expenses of TSI. See section 162.
20. Lloyd conceded that he was not entitled to deduct as farm labor expenses $ 1,600 in 1972 and $ 2,400 in 1973 which he paid to his young sons.↩
21. Lloyd also submitted evidence that he drove 1,100 miles in 1972 in connection with an option which he obtained (but did not exercise) on another farm. His list indicates that these miles were all driven before↩ he acquired the automobile in question here, so he is not entitled to use this mileage as grounds to depreciate this automobile.